# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
No. 25-0942V

|  |
|---|
| PAWEL TLOMAK, |
| Petitioner, |
| v. |
| SECRETARY OF HEALTH AND HUMAN SERVICES, |
| Respondent. |

Chief Special Master Corcoran

Filed: June 18, 2026

*Laura Levenberg, Muller Brazil, LLP, Dresher, PA, for Petitioner.*

*Lauren Kells, U.S. Department of Justice, Washington, DC, for Respondent.*

## FINDINGS OF FACT[1]

On June 3, 2025, Pawel Tlomak filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that that he suffered a shoulder injury related to vaccine administration ("SIRVA") resulting from an influenza ("flu") vaccine received on September 11, 2023. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

The parties negotiated, but reached an impasse (ECF Nos. 12-19). Respondent has filed his Rule 4(c) Report setting forth several objections (ECF No. 20). For the

---

[1] Because this Fact Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Fact Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

reasons set forth below, I determine that the record preponderantly supports a finding that Petitioner's shoulder pain likely began within 48 hours of vaccination, and that another condition would not likely explain his post-vaccination symptoms.

## I.    Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Human Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25, 1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health*

*& Human Servs.*, No. 90-2808, 1998 WL 408611, at \*5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such fact testimony must also be determined. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

## II.    Respondent's Position

Respondent asserts that Petitioner has not established that the onset of his shoulder pain occurred within 48 hours of vaccination. Respondent's Rule 4(c) Report, ECF No. 20, at \*9-10. Respondent notes that Petitioner did not seek care for shoulder pain until 107 days after vaccination despite several opportunities to do so, including appointments with his primary care provider ("PCP"). *Id*. Respondent further argues that Petitioner has not preponderantly established that no other condition or abnormality is present that would explain his symptoms, citing arthritis and degenerative changes present on his MRI, EMG/NCS results suggesting C6 and C7 radiculitis, and a pre-vaccination history of neck pain. *Id*. at \*11.

## III.    Findings of Fact

I make these findings after a complete review of the record, including all medical records, testimonial evidence, Respondent's Rule 4(c) Report, and additional evidence filed. Specifically, I highlight the following evidence:

*Pre-vaccination records*

- Petitioner had a pre-vaccination history of neck pain, with records dating from 2018-2023. Ex. 4 at 21-22; Ex. 2 at 45, 79; Ex. 7 at 2, 16. In 2021, he was assessed with cervical radiculopathy with paresthesias. Ex. 8 at 93.

- In July 2023, Petitioner underwent a physical therapy ("PT") evaluation for a three-year history of neck pain. Ex. 7 at 16. He continued PT until August 3, 2023 (a month prior to vaccination). *Id*. at 2-14.

3

*Vaccination and subsequent records and other evidence*

- Petitioner received a flu vaccine in his right deltoid on September 11, 2023. Ex. 1 at 3.

- On November 23, 2023, Petitioner was hospitalized with a myocardial infarction. Ex. 3 at 373, 376. He remained in the hospital until November 28th, and while hospitalized, underwent an occupational therapy ("OT") evaluation. Ex. 3 at 525. The evaluation record noted that he exhibited right upper extremity range of motion ("ROM") within functional limits, and was at his baseline for daily activities. *Id*. at 522, 525. The OT evaluation was done three hours before Petitioner was discharged from the hospital, and appears to have been intended to determine whether he was ready to go home and what, if any, cardiac rehabilitation he would need. *Id*. at 400, 522.[3]

- On November 29, 2023, Petitioner saw his PCP to follow up on his hospitalization. Ex. 2 at 141. He reported that he had experienced a heart attack, with a stent placed in response, and that he suffered from sepsis while hospitalized. *Id*. The record of this visit does not mention his shoulder, and no musculoskeletal examination was done. *Id*. at 141-42.

- Petitioner began outpatient cardiac rehabilitation on December 12, 2023. Ex. 3 at 1080. He reported "occasional neck and shoulder pain," without further details. *Id*.

- On December 27, 2023, Petitioner saw his PCP complaining of right upper arm pain "since the influenza vaccine three months ago." Ex. 2 at 133. He explained that his pain started on the date of vaccination. *Id*. His PCP ordered a blood test. *Id*.

- An electromyography and nerve conduction study done on February 8, 2024 revealed bilateral median neuropathy at the wrist and suggested right sided C6 and C7 radiculitis. Ex. 4 at 39. On the same day, Petitioner's neurologist assessed him with neuropathy, paresthesia of upper limb, muscle pain, and cervical radiculopathy. Ex. 8 at 48.

- On February 13, 2024, Petitioner consulted an orthopedist for right shoulder pain. Ex. 4 at 14. He rated his pain between two and four out of ten, and stated that his pain was worsening. *Id*. On examination, Petitioner's right shoulder ROM was limited, with positive Hawkins impingement sign and speeds test results. *Id*. The orthopedist noted that there was "no evidence of any radiculopathy . . . . His pain seems to be mainly related to [his] shoulder." *Id*.

---

[3] The discharge summary states that Petitioner was discharged at 11:02am on December 28th. Ex. 3 at 400. The OT evaluation was done at 8:02 am the same day. *Id*. at 522-26.

4

- Petitioner's February 21, 2024 right shoulder MRI showed tendinosis of the infraspinatus, supraspinatus, subscapularis, and biceps tendons, a near full-thickness delamination tear of the supraspinatus, a "moderate subcoracoid bursal effusion communicating with a small subacromial/subdeltoid bursal effusion," and mild to moderate osteoarthritis. Ex. 4 at 36.

- Petitioner returned to the orthopedist on February 27, 2024, to review the MRI. Ex. 4 at 12. He was assessed with cervical degenerative disc disease, impingement syndrome, and rotator cuff tear of the right shoulder, and referred to physical therapy ("PT"). *Id*. The orthopedist stated that he felt "pretty comfortable that his cervical spine is not involved in this." *Id*.

- On March 1, 2024, Petitioner underwent a PT evaluation of his right shoulder. Ex. 6 at 4. His pain had been present "for a few months." *Id*. He rated his pain four out of ten, ranging to five out of ten at worst. *Id*.

- Petitioner returned to his neurologist on June 13, 2024. Ex. 8 at 42. The record notes that Petitioner experienced pain following vaccination, occasional numbness in his hands, and was seeing another doctor for a right shoulder rotator cuff tear. *Id*. The neurologist listed the same diagnoses as the February 2024 visit, including cervical radiculopathy, with no specific treatment indicated. *Id*. at 42-43.

- Petitioner consulted a new orthopedist on June 21, 2024, reporting right shoulder pain that began on September 11, 2023 (the date of vaccination) and had persisted since then. Ex. 5 at 9. On examination, Petitioner's right shoulder exhibited full ROM, with positive Hawkins, Neer's, Obrien's, and Speed's tests. *Id*. at 10. His cervical ROM was decreased in flexion and extension. *Id*. The orthopedist assessed Petitioner with biceps tendon fraying, a supraspinatus full-thickness tear, moderate degenerative changes, and subacromial bursitis, and administered a steroid injection in his right shoulder. *Id*. at 10-11.

- On July 15, 2024, Petitioner returned to the orthopedist, reporting that the steroid injection received at the prior appointment had relieved his pain. Ex. 56 at 7.

- At an August 15, 2024 neurology follow up visit, Petitioner exhibited decreased right shoulder ROM on examination. Ex. 8 at 36.

- Petitioner filed a declaration in support of his claim, asserting that his right shoulder pain began immediately after vaccination. Ex. 9 at ¶ 7. The injection situs "was sore, painful, and aching every day for a very long time." *Id*. When he first sought care for his shoulder pain from his PCP in the fall of 2023 and later on December 27, 2023, his PCP "misdiagnosed me," running a blood test and concluding that he did not have muscle damage. *Id*.

- Petitioner states that the neck pain he had prior to vaccination is "totally different" from the shoulder pain he experienced after vaccination in terms of the origin, location, and severity of the pain, and impacted his health differently. Ex. 9 at ¶ 5. The prior neck pain felt like "stiffness, soreness, or tenderness in the neck" and was associated with working long hours on a computer. *Id*. at ¶ 6. Good rest and improved lifestyle provided relief. *Id*. In contrast, his shoulder pain following vaccination resulted in part of his right shoulder remaining sore, painful, and aching for a long time, with loss of function and mobility. *Id*. at ¶¶ 7-9. His shoulder injury has resulted in difficulty with self-care, household activities, pain lifting a cup of tea, and lost independence. *Id*. at ¶ 9.

The aforementioned medical records and testimonial evidence, reviewed in their totality, establish that Petitioner's shoulder pain likely began within in 48 hours of vaccination. When Petitioner first sought care for his shoulder pain, he told his PCP that his pain began on the day of vaccination and had persisted since then. Ex. 2 at 133. He told an orthopedist in June 2024 that his pain began on the date of vaccination and had persisted since then. Ex. 5 at 9. And Petitioner provided testimonial evidence stating that his pain began immediately after vaccination. Ex. 9 at ¶ 7.

Respondent's objections concerning onset are premised on Petitioner's delay in seeking care, coupled with the evidence of intervening cardiac rehabilitation and follow-up appointments with his PCP. But it is not uncommon for a SIRVA claimant to delay seeking care in the hope that the pain will resolve on its own. *Tully v. Sec'y of Health & Human Servs.*, No. 21-1998V, 2024 WL 4533515 (Fed. Cl. Spec. Mstr. Sept. 20, 2024) (finding onset occurred within 48 hours although claimant did not seek care for two and a half months); *Diaz v. Sec'y of Health & Human Servs.*, 20-1003V, 2023 WL 8440873, at *6 (Fed. Cl. Spec. Mstr. Nov. 1, 2023) (finding onset was within 48 hours where the petitioner delayed seeking care for over three months after vaccination); *Buck v. Sec'y of Health & Human Servs.*, No. 19-1301V, 2023 WL 6213423, at *7 (Fed. Cl. Spec. Mstr. Aug. 23, 2023) (finding onset of pain occurred within 48 hours where the petitioner did not seek care for over three months and noting that a delay in seeking care is relevant to onset, but not dispositive).

Additionally, Petitioner experience a notably-concerning medical issue during the post-vaccination period: a heart attack that required in-patient hospitalization. It is not surprising that he prioritized treating his heart condition – which is life-threatening – over his shoulder pain. *See, e.g.*, *DuLaney v. Sec'y of Health & Human Servs.*, No. 20-1488, 2022 WL 2912668 (Fed. Cl. Spec. Mstr. June 24, 2022) (finding that delay in seeking care with intervening hospitalization for heart condition and related follow-up did not prevent the petitioner from establishing that onset of pain occurred within 48 hours). Petitioner's cardiac event and hospitalization occurred over two months after vaccination, however,

and thus only partially justifies the treatment delay. As such, while the delay does not prevent him from establishing onset consistent with a Table SIRVA, it does suggest a less severe injury, which is relevant to damages.

I also find that the record best supports a finding that another condition or abnormality likely does not explain Petitioner's post-vaccination symptoms. Although Petitioner exhibited pre-vaccination neck pain, that pain was different from, and thus likely would not explain, his post-vaccination symptoms. Although Petitioner's EMG suggested C6 and C7 radiculitis, his neurologist noted that he was seeing an orthopedist for his rotator cuff tear. Ex. 8 at 42. And when Petitioner saw the orthopedist for shoulder pain after vaccination, the doctor noted that his pain "seems to be mainly related to shoulder" and that he felt "pretty comfortable that [Petitioner's] cervical spine is not involved in this." Ex. 4 at 12-15.

Furthermore, the fact that Petitioner's MRI revealed arthritis and degenerative changes, does not, by itself, suggest that these conditions resulted in his shoulder pain. These conditions were likely present before vaccination, but not causing shoulder pain; therefore, these conditions likely do not explain his post-vaccination symptoms.

Given the above, Petitioner is encouraged to promptly engage Respondent in settlement discussions. If efforts to resolve the matter are unsuccessful, further proceedings will be ordered as appropriate (including potential transfer of the matter out of SPU).

## Scheduling Order

- **Petitioner shall file, by no later than <u>Monday, August 17, 2026</u>, a status report providing an update on the parties' discussions. By that same day, <u>Respondent</u> shall file a status report indicating whether he wishes to file an amended Rule 4(c) Report and, if so, proposing a deadline for it.**

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master